UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES BROWN, SR., | ) 1:07-CV-01375-LJO-SMS |
| | ) |
| Plaintiff, | ) FINDINGS AND RECOMMENDATIONS RE: |
| | ) PLAINTIFF'S SOCIAL SECURITY |
| | ) COMPLAINT (Doc. 2) |
| v. | ) |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social | ) |
| Security, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

    Plaintiff is proceeding with counsel and is seeking judicial review of a final decision of the Commissioner of Social Security (Commissioner) denying an application for benefits. The matter has been referred to the Magistrate Judge pursuant to 28 U.S.C.§ 636(b) and Local Rule 72-302(c)(15). The matter is currently before the Court on the parties' briefs, which have been submitted without oral argument.

    I. Prior Proceedings

    On June 20, 2005, Plaintiff, born on July 22, 1967, applied for a period of disability and disability insurance benefits

(DIB) under Title II of the Act, alleging disability beginning on March 1, 2004, due to his back condition. (A.R. at 60-62, 70.) Plaintiff's claim was denied initially and on reconsideration. (Id. at 41-42.) Plaintiff requested a hearing before an administrative law judge (ALJ) of the Social Security Administration (SSA). On March 23, 2007, Plaintiff appeared with an attorney and testified before Stephen Webster, an administrative law judge (ALJ). (A.R. 11.) On May 16, 2007, the ALJ denied Plaintiff's application for benefits. (Id. at 11-18.) Plaintiff sought review of the ALJ's decision by the Appeals Council. On July 18, 2007, the Appeals Council denied Plaintiff's request for review. (A.R. 4-6.)

On September 19, 2007, Plaintiff filed the complaint in the instant action; the administrative record was lodged by Defendant on January 22, 2008. On July 5, 2008, Plaintiff filed an opening brief. On September 8, 2008, Defendant filed a brief in opposition.

III. Standard and Scope of Review

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence means "more than a mere scintilla," Richardson v. Perales, 402 U.S. 389, 402 (1971), but less than a preponderance, Sorenson v. Weinberger, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

Richardson, 402 U.S. at 401. The Court must consider the record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion; it may not simply isolate a portion of evidence that supports the decision. Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). It is immaterial that the evidence would support a finding contrary to that reached by the Commissioner; the determination of the Commissioner as to a factual matter will stand if supported by substantial evidence because it is the Commissioner's job, and not the Court's, to resolve conflicts in the evidence. Sorenson v. Weinberger, 514 F.2d 1112, 1119 (9th Cir. 1975).

In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must review the whole record and uphold the Commissioner's determination that the claimant is not disabled if the Commissioner applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. See, Sanchez v. Secretary of Health and Human Services, 812 F.2d 509, 510 (9th Cir. 1987); Jones v. Heckler, 760 F.2d at 995. If the Court concludes that the ALJ did not use the proper legal standard, the matter will be remanded to permit application of the appropriate standard. Cooper v. Bowen, 885 F.2d 557, 561 (9th Cir. 1987).

IV. Disability

In order to qualify for benefits, a claimant must establish

3

that she is unable to engage in substantial gainful activity due
to a medically determinable physical or mental impairment which
has lasted or can be expected to last for a continuous period of
not less than twelve months. 42 U.S.C. §§ 416(i), 1382c(a)(3)(A).
A claimant must demonstrate a physical or mental impairment of
such severity that the claimant is not only unable to do the
claimant's previous work, but cannot, considering age, education,
and work experience, engage in any other kind of substantial
gainful work which exists in the national economy. 42 U.S.C.
1382c(a)(3)(B); <u>Quang Van Han v. Bowen</u>, 882 F.2d 1453, 1456 (9th
Cir. 1989). The burden of establishing a disability is initially
on the claimant, who must prove that the claimant is unable to
return to his or her former type of work; the burden then shifts
to the Commissioner to identify other jobs that the claimant is
capable of performing considering the claimant's residual
functional capacity, as well as her age, education and last
fifteen years of work experience. <u>Terry v. Sullivan</u>, 903 F.2d
1273, 1275 (9th Cir. 1990).

The regulations provide that the ALJ must make specific
sequential determinations in the process of evaluating a
disability: 1) whether the applicant engaged in substantial
gainful activity since the alleged date of the onset of the
impairment, 20 C.F.R. § 404.1520 (1997);[1] 2) whether solely on
the basis of the medical evidence the claimed impairment is
severe, that is, of a magnitude sufficient to limit significantly
the individual's physical or mental ability to do basic work

---

[1] All references are to the 2007 version of the Code of Federal Regulations unless otherwise noted.

activities, 20 C.F.R. § 404.1520(c); 3) whether solely on the basis of medical evidence the impairment equals or exceeds in severity certain impairments described in Appendix I of the regulations, 20 C.F.R. § 404.1520(d); 4) whether the applicant has sufficient residual functional capacity, defined as what an individual can still do despite limitations, to perform the applicant's past work, 20 C.F.R. §§ 404.1520(e), 404.1545(a); and 5) whether on the basis of the applicant's age, education, work experience, and residual functional capacity, the applicant can perform any other gainful and substantial work within the economy, 20 C.F.R. § 404.1520(f).

Here, the ALJ found that Plaintiff had the severe impairment of degenerative disc disease which did not meet or medically equal a listed impairment; however, Plaintiff retained the residual functional capacity (RFC) to lift and/or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk for six hours out of an eight-hour day work day; and sit for six hours out of an eight-hour work day. (A.R. 14.) Thus, Plaintiff was able to perform his past relevant work of a production supervisor and therefore was not disabled. (A.R. 17-18.)

V. Plaintiff's Admissions and Testimony at the Hearing

In a face-to-face interview with Plaintiff on June 20, 2005, a disability field worker observed that Plaintiff had no problem concentrating, understanding, answering, sitting, standing, or walking, and he was able to lift an infant child in a baby carrier with no problem; he was very talkative and upbeat, and no limitations or obvious pain were displayed. (A.R. 84-86.) Plaintiff stated that he felt that he could probably work if he

5

had a "sitdown job," and he wanted to teach because he could do that even if confined to a wheelchair. (A.R. 86.)

Plaintiff admitted to Dr. Tran in September 2005 that he could sit and stand each up to two hours at a time; his pain, which was sharp and grabbing and 5-6/10 in intensity, permitted cooking, house chores, and washing dishes, and his only medication was twenty-five milligrams of Elavil. (A.R. 159.) Dr. Tran noted Plaintiff was a well developed, muscular male who walked without assistance and could tolerate sitting. (A.R. 160.)

At the hearing held in March 2007, Plaintiff testified that he suffered a back problem and sleep apnea; his primary care physician through Medi-CAL was Dr. Jesus Rodriguez, and he had begun seeing Dr. Senitha Nalavenkata at the Veteran's Administration (VA); his doctors prescribed medication for pain in the mid to lower back which sometimes shot down one leg or the other, and the medication, taken thrice daily, often relieved his pain, but it made him sleepy or groggy with a dry mouth, and so he slept a lot and read. (A.R. 275-76.)

The pain was almost constant and never really went away; Plaintiff described it as being like a throb that never stopped and involved a lot of pressure across his back from the middle of the back down that felt like a toothache with cold air sucked into it, or a tooth nerve pain. (A.R. 283.) About four days a week his back and everything were so tightened up that he needed help from his wife to get up and shower; then Plaintiff would take medication. Plaintiff took daily 1600 milligrams of Neurontin, over 2,000 milligrams of Tylenol with additional Tylenol in Vicodin, Elavil for sleep, and Hydrochlorothiazide

because of elevated blood pressure. (A.R. 284.) The medication made Plaintiff very moody in addition to groggy and sleepy, and he believed it contributed to his depression and kept school from working. (A.R. 285.) He estimated he could concentrate perhaps six to eight or twelve hours a week. (A.R. 286.)

The severe pain occurred two to three times a month, with the episodes becoming closer together and hitting harder and the pain going down one leg or the other but usually not both. (A.R. 282-83, 286s.) He saw Dr. Rodriguez about two to three times a month and was treated with mostly medication, including a non-narcotic injection of Toradol for bad flares of pain that were blinding and prohibited movement or function. (A.R. 281-82.) After an hour after the shot, Plaintiff could move, and other medications, such as Soma or Vicodin, would induce sleep for usually two to three days, but sometimes nearly a week would pass without Plaintiff's being able to do anything. (A.R. 282.) Plaintiff would have the injection every five to six weeks for pain that would render him unable to do anything, including getting up from the floor. (A.R. 281-82.)

Plaintiff testified that he lived with his wife and his four young sons; he took care of his personal needs most of the time and helped with the laundry, cooking, mopping, sweeping, and vacuuming, although he did not feel like he could do enough; he helped some with childcare but could no longer pick up his youngest child, who was two years old. He took the bus and even drove sometimes but limited driving when the pain was too great to drive or medication rendered driving unsafe. (A.R. 269-70.)

Plaintiff could watch television four to six hours a day,

read for four to six hours a day, and he spent a couple of hours a day on the computer. (A.R. 270.) He lay down about three to four times a day for more or less an hour or two at a time. (A.R. 285.) He was unable to continue being a customer service representative and carrier for a newspaper, which he had done between May 2004 through December 2005, due to physical inability to enter and exit the car and throw newspapers. (A.R. 272.) He was unable to finish a college curriculum designed to permit him to teach because he could not sit through the classes due to inability to sit more than maybe an hour or so at a time; he could stand about an hour and one-half at a time before being worn out, and he could walk no more than a block; he was unable to walk his children to their school, which was two and one-half blocks away. (A.R. 276, 283-84.) He could lift no more than twenty pounds. (A.R. 276.)

For Plaintiff's sleep apnea, Plaintiff testified that he used a C-flex machine that pulled on him and sometimes did not help with a good night's sleep. (A.R. 286.)

VI. <u>Medical Evidence</u>[2]

In an underexposed radiological study done in August 2004 of the lumbosacral spine, degenerative change and disc space narrowing at L4-5 was observed, and the radiologist suspected slight spondylolisthesis at L5-S1; he recommended more studies to permit evaluation of a possibility of a defect in the pars interarticularis. (A.R. 116.)

Moderate to severe obstructive sleep apnea was diagnosed in

[2] Only evidence relating to Plaintiff's physical impairment is summarized because no issue is raised with respect to any mental impairment.

May 2005, and Plaintiff was treated with nasal CPAP nightly with a recommendation to lose weight; alternative treatments included mandibular repositioning or surgery for the obstruction of the upper airway. (A.R. 109.) Plaintiff was treated for back pain with anti-inflammatory medications and a reference to physical therapy in June 2005. (A.R. 174.) The VA denied his request for physical therapy despite symptoms in September 2005 of severe pain with ambulation, positive straight leg raise in left leg, and ambulation favoring the right leg. (A.R. 172.)

A radiological study of the lumbar spine taken July 29, 2005, revealed satisfactory alignment with vertebral body height maintained; there was minimal narrowing of the L5-S1 intervertebral disc space seen posteriorly; no spondylolisthesis was seen, but spondylolysis of the L5 vertebra could not be excluded. (A.R. 157.) Plaintiff had complained of pain of 6/10 in the lower back, and he desired pain medication; his pain had been regular for the past six months, but there was no shooting to the legs, tingling, numbness, or weakness in the lower extremities. (A.R. 129-30.)

Dr. Juliane Tran, M.D., who was board certified in physical medicine and rehabilitation, performed a comprehensive orthopedic evaluation of Plaintiff on September 23, 2005, after reviewing handwritten progress notes indicating back pain for fifteen years and a history of spondylolisthesis but without reviewing any scans or x-ray studies. (A.R. 159-62.) Plaintiff reported pain worsening within the past year and aggravated with activities of bending, sitting, standing, but improving with supine position.

Dr. Tran observed that Plaintiff ambulated well and walked

without assistance. There was mild tenderness to palpation over the left sciatic notch and the right and left L5 S1 lumbar level, with negative straight-away gait, straight leg raising, Fabian and Romberg tests, and tandem gait; toe-heel walking, proprioception, and sensory examination in the lower extremities were normal. Motor strength was 5/5 with no evidence of muscle atrophy.

Dr. Tran's impression was back pain that was probably mechanical in origin with lumbar spondylosis with end discogenic back pain, and more pain with lumbar extension than flexion. Plaintiff would be restricted with activities involving lifting more than 100 pounds occasionally and fifty pounds frequently; there was no climbing, balancing, or working with heights; and Plaintiff was "restricted with activities involving frequent bending, stooping, kneeling, or crouching," (A.R. 161), but there was no restriction with sitting, standing, fingering, grasping, or overhead reaching. (A.R. 161-62.)

A week later Plaintiff visited the hospital for back pain at a level of 7/10 that radiated to the buttocks and was precipitated by leaning forward; he exhibited non-tender extremities with full range of motion, negative straight leg raising, and no apparent motor or sensory deficits. The impression was acute lumbar myofascial strain and acute low back pain. Medicines administered were Toradol and Vicodin (A.R. 194, 196, 199.)

An MRI study taken on October 13, 2005, only three weeks after Dr. Tran's exam, reflected multilevel degenerative disc disease causing neural foraminal and central canal stenosis.

(A.R. 193.) Specifically, at L2-3 there was disc dessication and mild circumferential disc bulging without significant central canal or neural foraminal stenosis. At L3-4 there was circumferential disc bulging with focal right lateral disc protrusion extending into the neural foramen contacting the undersurface of the exiting right L3 nerve root; there was also moderate right and mild left neural foraminal stenosis but no significant central canal stenosis. At L4-5 there was disc dessication and circumferential disc bulging with mild facet hypertrophy resulting in mild central canal stenosis and mild bilateral neural foraminal stenosis with minimal loss of disc space. At L5-S1 there was disc dessication with mild central disc protrusion without significant central canal or neural foraminal stenosis. (A.R. 168-69.) The vertebral alignment was normal without loss of height. Plaintiff reported at that time that Naprosyn controlled the pain with the exception of some episodes. (A.R. 166.)

In December 2005, Plaintiff had exacerbated, shooting pain of 8/10 with tenderness and muscle spasm but no radiation; he could ambulate with a steady gate. He was treated with Vicodin, Flexeril, and Naproxen as well as daily exercise. (A.R. 164, 178, 181.) He was to rest and sleep with pillows behind his knees. (A.R. 186.)

On November 17, 2005, non-examining state agency medical consultant Dr. Brian Ginsburg completed an evaluation of Plaintiff and opined that due to back pain, Plaintiff could lift and carry 100 pounds occasionally and fifty pounds frequently, and otherwise engage in unlimited pushing or pulling; stand

and/or walk for about six hours in an eight-hour day; sit for about six hours in an eight-hour day; and perform only occasional climbing ramps and stairs (but with no climbing of ladders, ropes, and scaffolds), with only occasional balancing, stooping, kneeling, crouching, and crawling. (A.R. 205-14.) There is no indication that Dr. Ginsburg had access to the results of the MRI performed in October 2005. (A.R. 205.)

Another state agency medical consultant whose name is illegible affirmed Dr. Ginsburg's evaluation as written in January 2006. (A.R. 214.) It appears that this evaluator did have access to the results of the MRI performed in October 2005. (A.R. 203-04.)

Undated progress notes reflect that Plaintiff complained of worsening back pain that caused him to miss school; he had quit his newspaper job. (A.R. 243.) In February 2006 he complained of pain that was 6/10 and had continued for nine months; he used Vicodin and Soma two to three times a week. Pain with bending and picking up things caused him not to be able to work, although he continued with school. His range of motion upon exam was limited secondary to pain. The impression was lower back pain secondary to disc bulging; medications were refilled. (A.R. 242.)

On February 28, 2006, Dr. Rodriguez stated in a medical report for verification of incapacity for general assistance eligibility (CalWorks) that Plaintiff could perform no work, had partial capacity to lift, push, and pull from zero to ten pounds, partial capacity for continuous sitting and standing, and full capacity for minimal use of hands, but he had no capacity for lifting, pushing, or pulling more than ten pounds. Dr. Rodriguez

stated that the disability was not permanent and would extend through September 1, 2006. (A.R. 232.)

In March 2006, Plaintiff reported to Dr. Rodriguez that he had missed many days of school secondary to back pain and needed a note; he had no leg weakness or radiation of pain to the legs; he had gone to the emergency room for pain on March 3 and had been given Toradol, which resulted in good improvement of the pain. Dr. Rogriguez examined Plaintiff on March 6, 2006, and found lumbosacral pain with movement. The impression was lower back pain secondary to neural foraminal stenosis, which was treated with medication. (A.R. 238.)

Dr. Rodriguez completed a medical assessment of Plaintiff's ability to do physical work-related activities on March 6, 2006. (A.R. 239-41.) The assessment was on a printed form with boxes to be checked and blanks to be filled in with information. Dr. Rodriguez opined that Plaintiff could not lift any weight frequently or occasionally due to multilevel degenerative disc disease causing neural foraminal stenosis, and circumferential disc bulging with focal right lateral protrusion at L3-4, resulting in moderate right and mild left neural foraminal stenosis. Based on the same findings, Plaintiff could stand a total of two to four hours, and for twenty to forty minutes without interruption. (A.R. 239.) He could sit for two to four hours total, and for twenty to thirty minutes without interruption. He could never climb, kneel, crouch, stoop, balance, or crawl; reaching, pushing, and pulling could worsen the underlying problem. (A.R. 240.) Further, he was at risk of falling, and vibration could worsen his back; thus, there were

restrictions involving heights, moving machinery, and vibrations. (A.R. 241.)

On April 20, 2006, Plaintiff reported that he had an appointment with a surgeon in two weeks. (A.R. 236.)

On May 19, 2006, a CT scan of the lumbar spine without contrast revealed that many of the disc spaces and vertebral bodies appeared unremarkable (the T12-L1, L1 vertebral space, L1-2 disc space, L2 vertebral body, L2-3 level, L3 vertebral body, and L4 vertebral body were unremarkable). However, the L3-4 level showed a laminotomy[3] defect on the left and mild to moderate facet hypertrophy; at the L4-5 disc space level, there was moderate to severe hypertrophy; and at the L5 level, there was a pars defect bilaterally, and the L5-S1 disc appeared to have some vacuum disc phenomenon. (A.R. 234.)

Further, x-ray studies taken the same day of the lumbar spine in lateral upright and flexion and extension views, and views of the patient bending to the left and right, revealed no evidence of spondylolisthesis, and vertebral heights were maintained. There was limited range of motion with flexion, better range of motion with extension, and slightly limited lateral flexion of the spine to the right as compared with the left. (A.R. 235.)

Progress notes from the VA Central California HCS dated May 24, 2006, revealed that Plaintiff reported that he had been informed by an outside orthopedist that he needed surgery, but he needed to be evaluated and treated at the VA because he was

---

[3] "Laminotomy" refers to division of the lamina of a vertebra. Dorland's Medical Dictionary (28th Ed. 1994) p. 989.

14

service related.[4] He was advised to go to radiology and have his studies sent there, and an orthopedic consult was requested. (A.R. 255.)

On August 21, 2006, Plaintiff reported constant back pain to Dr. Rodriguez. It was noted that "medical" (apparently a reference to Medi-CAL) would not cover the equipment for back surgery; the pain was worsening, but the medications controlled the pain most days. There was no leg weakness or numbness. There was lumbosacral pain to palpation. Medications were refilled. (A.R. 233.)

VA progress notes from September 21, 2006, reflect that Plaintiff had called because of a significant pain increase that day to 8/10, accompanied by inability to get out of bed without help. (A.R. 254.) The medications that the private doctor had ordered did not help much. (A.R. 250.) There was good neurological sensation except in the heels bilaterally; reflexes were positive and gait normal, and the straight leg raising test was negative. Dr. Nalavenkata, Plaintiff's primary care physician at VA, increased Plaintiff's Gabapentin (Neurontin) dosage and planned to get copies of Plaintiff's MRI and CAT scan. (A.R. 251.)

On September 25, 2006, Plaintiff reported to Dr. Rodriguez that he had seen a doctor at the VA hospital who was doing lots of tests and examinations; Plaintiff was in pain at 6/10 constantly and was unable to function or attend school. He exhibited tenderness with palpation of the lower back. (A.R.

---

[4] Plaintiff had initially suffered a back injury while in military service in 1990. (A.R. 164.)

231.) In November 2006, Plaintiff complained of constant pain that was the same as before, and he asked for a note in order to drop his class. (A.R. 229.)

VA progress notes showed that on December 14, 2006, Plaintiff reported no night pain or tingling or numbness; he was given a note for school because he missed classes due to back pain. (A.R. 249.) The doctor gave Plaintiff temporary disability until he completed school, planned to repeat the MRI, and advised Plaintiff of the risks and benefits of back surgery. (A.R. 249-50.)

Notes from an MRI of the lumbar spine taken on January 3, 2007, and ordered by Dr. Sunitha Nalavenkata, who desired an evaluation for surgery, revealed that there was a mild, broad-based disc bulge at L4/5, and mild spondylolisthesis of L5 on S1 with bilateral spondylolysis of L5. (A.R. 258.)

Progress notes from VA reflect that on February 6, 2007, Plaintiff reported pain in the middle to lower back of 7/10, but no new neurological signs, although he suffered mild upper thoracic back pain because he was doing more reading for school. (A.R. 245-47.) Plaintiff was advised to take showers and use the correct posture when he read; he declined to participate in a weight management program, which it was determined would benefit him. (A.R. 247.)

VII. <u>Credibility Determinations</u>

Plaintiff argues that the reasons given for negative credibility findings are not supported by the record, and he challenges as unclear the following credibility findings made by the ALJ:

In reaching this decision, I have also considered the allegations of the claimant's pain, symptoms, and limitations as required by Ninth Circuit case law, 20 CFR 404.1529(c), and Social Security Ruling 96-7p.

However, I find that the statements concerning the intensity, duration and limiting effects of those symptoms are not entirely credible for the following clear and convincing reasons. <u>First</u>, the analysis of the claimant's non severe impairments, supra, is incorporated by reference herein. <u>Second</u>, the objective medical evidence does not show pathology reasonably likely to cause the debilitating symptoms alleged. <u>Third</u>, the claimant's treatment has been routine or conservative in nature. <u>Fourth</u>, the record reflects some gaps in treatment, further indicating that the claimant's symptoms and limitations have not been as serious as has been alleged in connection with this application and appeal. <u>Fifth</u>, the claimant is not taking medications of a type and dosage consistent with his allegations. <u>Sixth</u>, the record does not indicate that the claimant suffers from debilitating side effects from his medication. <u>Seventh</u>, no treating or examining physician has stated that the claimant is totally and permanently disabled from all work. <u>Eighth</u>, the claimant was able to participate in the instant hearing and respond to the questioning without any apparent difficulties. <u>Ninth</u>, concerning his activities of daily living, the claimant has described and testified to daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations.

After considering the evidence of record, I find that the claimant's medically determinable impairment could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are generally credible but not to the extent alleged.

(A.R. 16-17.)

Further, in explaining the weight put on Dr. Rodriguez's opinion of Plaintiff's functional capacities, the ALJ stated that Dr. Rodriguez's opinion was inconsistent with other substantial evidence of record, and he expressly noted that such a finding was supported by evidence that included Plaintiff's statement to the claims representative that he felt he probably could work if

17

he had a "sitdown job" and the representative's observation of
Plaintiff's lifting the infant in the child carrier without
difficulty and the absence of any display of any limitations or
obvious pain. The ALJ further cited Plaintiff's own description
of his abilities. (A.R. 17.) The ALJ had previously discussed
Plaintiff's testimony that he could lift twenty pounds, take care
of his personal needs, drive a car sometimes, help with the
household chores, take public transportation, read four to six
hours, watch television four to six hours daily, and do some
computer work. (A.R. 14.)

Unless there is affirmative evidence that the applicant is
malingering, then where the record includes objective medical
evidence establishing that the claimant suffers from an
impairment that could reasonably produce the symptoms of which
the applicant complains, an adverse credibility finding must be
based on clear and convincing reasons. Carmickle v. Commissioner,
Social Security Administration,, 533 F.3d 1155, 1160-61 (9th Cir.
2008).

Here, not only was there no finding of malingering, but the
ALJ also expressly found that Plaintiff's degenerative disc
disease could reasonably be expected to produce the alleged
symptoms, and that Plaintiff's statements about his symptoms were
generally credible. (A.R. 17.) Thus, clear and convincing reasons
are required.

The findings of the adjudicator must be properly supported
by the record and must be sufficiently specific to allow a
reviewing court to conclude that the adjudicator rejected the
claimant's testimony on permissible grounds and did not

arbitrarily discredit a claimant's testimony. <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 345-46; <u>Byrnes v. Shalala</u>, 60 F.3d at 641-42 (9ᵗʰ Cir. 1995); <u>see</u> 20 C.F.R. § 404.1529(c) [disability].

The court in <u>Orn v. Astrue</u>, 495 F.3d 625, 635 (9ᵗʰ Cir. 2007), summarized the pertinent standards for evaluating the sufficiency of an ALJ's reasoning in rejecting a claimant's subjective complaints:

> Social Security Administration rulings specify the proper bases for rejection of a claimant's testimony. See S.S.R. 02-1p (Cum. Ed.2002), available at Policy Interpretation Ruling Titles II and XVI: Evaluation of Obesity, 67 Fed.Reg. 57,859-02 (Sept. 12, 2002); S.S.R. 96-7p (Cum. Ed.1996), available at 61 Fed.Reg. 34,483-01 (July 2, 1996). An ALJ's decision to reject a claimant's testimony cannot be supported by reasons that do not comport with the agency's rules. See 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have the same force and effect as the statute or regulations, they are binding on all components of the Social Security Administration, ... and are to be relied upon as precedents in adjudicating cases."); see <u>Daniels v. Apfel</u>, 154 F.3d 1129, 1131 (10th Cir.1998) (concluding that ALJ's decision at step three of the disability determination was contrary to agency regulations and rulings and therefore warranted remand). Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." <u>Fair</u>, 885 F.2d at 603; see also <u>Thomas</u>, 278 F.3d at 958-59.

A claimant's ability to engage in activities of daily living to the extent that he or she spends a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to the work setting is relevant; a specific finding as to this fact may be sufficient to discredit a claimant's allegations. <u>Morgan v. Commissioner of Social Sec. Admin.</u>, 169 F.3d 595, 600 (9ᵗʰ Cir. 1999); <u>Thomas v. Barnhart</u>,

278 F.3d 947, 959 (9th Cir. 2002).

Here, the record supported the ALJ's express finding that Plaintiff's own daily activities, and his own statements concerning those activities, were inconsistent with allegations of constant, completely disabling pain. Reading and watching television for up to twelve hours a day, with a further couple of hours on the computer, might not be sufficiently probative of an ability to maintain employment. See, Orn v. Astrue, 495 F.3d 625, 639 (9th Cir. 2007). However, performance of routine household tasks (mopping, sweeping, vacuuming, cooking, laundry, childcare) and personal care; driving and taking public transportation; and lifting twenty pounds all are activities that involve functions or skills that may be transferred to the workplace. See, Morgan v. Commissioner, 169 F.3d 595, 600 (9th Cir. 1999) (ability to fix meals, do laundry, work in the yard, and occasionally care for a friend's child were evidence of an ability to work because they reflected participation for a substantial part of the day in pursuits involving the performance of physical functions transferable to a work setting).

Likewise, inconsistencies between a plaintiff's claimed limitations and his reports of his abilities to third parties may constitute clear and convincing reasons. Cf. Morgan v. Commissioner, 169 F.3d 595, 599-600 (9th Cir. 1999). Although Plaintiff testified to an inability to maintain class attendance or to perform any job because of inability to sit, he had told a worker almost two years before the hearing that he could probably work if he had a "sitdown" job. (A.R. 84-86.) The Court notes that after Plaintiff made this statement, he reported worsening

20

symptoms and received different medications and recommendations for less conservative treatment; he subsequently ceased his efforts at education because of the limited amount of time he could concentrate because of his medications and pain. Therefore, although there is an inconsistency, its probative force is somewhat limited because of documentation of developing symptoms and treatment after the statement was made.

Likewise, the field worker's observation of Plaintiff's lifting an infant car seat with an infant in it in June 2005 without apparent difficulty is of limited probative force. The child was an infant according to both the field worker and Plaintiff, who testified that the youngest was just two years old at the time of hearing in March 2007. (A.R. 270.) Thus, it is quite likely that the amount of weight involved was minimal and was not inconsistent with Plaintiff's claim that he could lift no more than twenty pounds.

With respect to the ALJ's own observation that Plaintiff was able to participate in the hearing and respond to the questioning without any apparent difficulties, observations by the ALJ of a person's functioning may not form the sole basis for discrediting a person's testimony; rather, they may be used only in the overall evaluation of the credibility of the individual's statements. Orn v. Astrue, 495 F.3d 625, 639-40 (9th Cir. 2007) (citing S.S.R. 96-7p at 7). The ALJ appropriately relied on his observations as only one factor in evaluating Plaintiff's overall credibility.

The ALJ's incorporation by reference of the analysis of non-severe impairments (A.R. 16, 13-14) served to incorporate the

ALJ's decision concerning the nonseverity of Plaintiff's depression and sleep apnea on pages 13-14 of the administrative record, and his reliance on Plaintiff's own statements and testimony about lifting twenty pounds and other activities of daily living. It also incorporated the ALJ's decision to place less weight on the opinions of state agency consultants who determined initially and on reconsideration that Plaintiff could perform a heavy level, and light level, respectively, of work activity with occasional postural limitations, and could frequently climb ramps and stairs but never climb ladders, ropes, or scaffolds. The ALJ expressly afforded those opinions less weight because they never had an opportunity to review subsequently admitted evidence. (A.R. 14.) The ALJ also concluded that the "objective evidence, including the claimant's own description of his abilities," was consistent with light work. (A.R. 14.) Reliance on Plaintiff's own statements and testimony has been previously discussed.

The record did not support the ALJ's conclusion that Plaintiff's own description of his abilities was consistent with performance of light work. (A.R. 17.) Light work involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. 20 C.F.R. § 404.1567(b). Because frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or

walking, off and on, for a total of approximately six hours of an eight-hour workday; sitting may occur intermittently during the remaining time. Id. Thus, one with significant limitations on the ability to stand may be functionally incapable of doing the prolonged standing necessitated by light work. Gallant v. Heckler, 753 F.2d 1450, 1455-57 (9th Cir. 1984) (discussing a claimant whose persistent back pain prevented him from prolonged periods of sitting or standing).

Plaintiff testified that standing was a problem; more than about an hour, or perhaps an hour and one-half at a time, wore him out; he could walk only a block and could not walk the two or so blocks to his children's school. (A.R. 276.) Further, sitting more than an hour at a time was a problem and caused him to be unable to complete college. (A.R. 276.) What is reasonably interpreted as a capacity for only a short, single period of standing is not consistent with the full range of light work, which requires frequent lifting or carrying and thus necessitates being on one's feet up to two-thirds of a work day, or for a total of approximately six hours in an eight-hour workday. Soc. Sec. Ruling 83-10 at 5.

Therefore, substantial evidence did not support the ALJ's conclusion that Plaintiff's own description of his abilities was consistent with the ability to do light work.

Included in the factors that an ALJ may consider in weighing a claimant's credibility are the claimant's reputation for truthfulness; inconsistencies either in the claimant's testimony or between the claimant's testimony and the claimant's conduct, daily activities, or work record; and testimony from physicians

and third parties concerning the nature, severity, and effect of the symptoms of which the claimant complains. Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002). The ALJ may consider whether the Plaintiff's testimony is believable or not. Verduzco v. Apfel, 188 F.3d 1087, 1090 (9th Cir. 1999). The ALJ's consideration of the inconsistencies presented between Plaintiff's daily activities and his subjective claims, as well as the ALJ's observation of Plaintiff's ability to sit and testify at the brief hearing, were appropriate and supported by substantial evidence.

The objective medical evidence is an appropriate type of evidence for an ALJ to consider if it is only one factor among others considered; it is not sufficient as a sole reason for rejecting a subjective complaint. Light v. Chater, 119 F.3d 789, 792 (9th Cir. 1997); Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004); Morgan v. Commissioner 169 F.3d 595, 600 (9th Cir. 1999).

Here, the ALJ concluded that the objective medical evidence did not show pathology reasonably likely to cause the debilitating symptoms alleged. (A.R. 16.) However, the record does not contain substantial support for this conclusion. The record contains multiple studies reflecting not only mild findings but also moderate to severe conditions manifesting Plaintiff's degenerative disc disease, including spondylolisthesis, spondylolysis, laminotomy defect, a pars defect, vacuum disc phenomenon, and varying degrees of neural foraminal and central canal stenosis and facet hypertrophy. Indeed, Plaintiff undisputably suffered from disc bulging with

focal right lateral disc protrusion extending into the neural
foramen and actually <u>contacting</u> the undersurface of the L3 nerve
root. The record also contains the opinion of Dr. Rodriguez to
the effect that these studies showed conditions that resulted in
Plaintiff's being unable to perform lifting, standing, or sitting
as required for work, or to engage in various postures. Given
this evidence, it cannot be said that the record does not show
pathology reasonably likely to cause the debilitating symptoms.

The ALJ's reasoning that Plaintiff's treatment had been
routine or conservative in nature (A.R. 16) does not have clear
and convincing force in the context of the entire record. An ALJ
may rely on a claimant's unexplained or inadequately explained
failure to seek treatment or follow a prescribed course of
treatment in rejecting a subjective complaint of disabling pain.
<u>Orn v. Astrue</u>, 495 F.3d 625, 638 (9th Cir. 2007); <u>Fair v. Bowen</u>,
885 F.2d 597, 603 (9th Cir. 1989). However, the individual
circumstances of the claimant must be factored in to an analysis
of the conservative or minimal nature of treatment. Gaps in
medical treatment were held not to constitute a clear and
convincing reason for discounting subjective complaints where the
claimant lacked the financial ability to pay for medical
treatment. <u>Orn v. Astrue</u>, 495 F.3d at 638. Pursuant to S.S.R. 96-
7p, before drawing inferences about symptoms and their functional
effects from a failure to seek or pursue regular medical
treatment, an adjudicator must first consider any explanations
that a person may provide, or other information in the case
record, that may explain infrequent or irregular medical visits,
including ability to pay, whether daily activities may be

structured so as to minimize symptoms to a tolerable level or eliminate them entirely, and whether medication may relieve symptoms. Id.

Here, Plaintiff's family survived on TANF (formerly AFDC), food stamps, WIC, and Medi-CAL; Plaintiff obtained most of his treatment and medications from his primary care physician through Medi-CAL, Dr. Rodriguez. (A.R. 275, 255.) A request for physical therapy was denied in September 2005; although the record reflects that Plaintiff had an appointment with a surgeon in April or May 2006, and he was further informed by an orthopedist that he needed surgery, he was required to go to VA because his original injury was service-related. (A.R. 172, 236, 255.) In August 2006, Dr. Rodriguez noted that "medical" (probably a reference to Medi-CAL) would not cover the equipment for back surgery despite worsening pain. (A.R. 233.)

It thus clearly appears from the record that despite medical recommendations for physical therapy and surgery, Plaintiff, who regularly sought treatment, lacked the financial resources for those two treatments that were beyond the routine and conservative regimen of medication and very probably more expensive than medication. The ALJ did not engage in any examination of these or related circumstances or factor this information in to the analysis. Because it appears that Plaintiff had very limited financial resources and was unable to undertake multiple recommended or ordered treatments because of poverty, Plaintiff's failure to seek or obtain additional treatment was not necessarily inconsistent with his subjective complaints of growing discomfort. The ALJ's reasoning in this regard thus was

not clear and convincing.

The ALJ reasoned that some gaps in treatment were reflected in the record, and that this further indicated that symptoms and limitations had not been as serious as alleged in connection with the application and appeal. (A.R. 16.) There was no reference to any specific gap, so the Court understands the ALJ's reasoning to refer to repeated periods of lack of treatment.

A review of the record reveals that it begins in August 2004 with Plaintiff returning for follow up after an unidentified interval at Sequoia Community Health Centers for back strain. (A.R. 115.) Treatment continued with visits in October and November 2004 for other ailments. (A.R. 113-14.)

A gap in the medical record thus exists from March 1, 2004, the date Plaintiff alleged that he first became unable to work, until August 2004. However, considering how Plaintiff's condition deteriorated over time, evidence of a gap at this initial point in the continuum of time is not clear and convincing in probative force.

Another gap exists in records of back treatment in the autumn of 2004 until March 2005, where the treatment record referred to the previous prescription for anti-inflammatory medication. (A.R. 112.) It thus appears that Plaintiff was initially treated with anti-inflammatory medication, and continued that treatment through early 2005 until studies were taken and Plaintiff was referred to physical therapy in the summer of 2005. Again, the gap does not necessarily reflect a lack of symptoms as much as use of medication with development of diagnosis and other treatment as symptoms progressed.

After physical therapy was denied (A.R. 173-74), Plaintiff continued with examinations, testing, and treatment throughout 2005; one failure to show for an appointment in December 2005 was followed by an appointment four days later with an explanation that Plaintiff had gone to emergency for back pain relief. (A.R. 164-65.)

Plaintiff's regular treatment continued in 2006, and he further sought out and apparently saw an orthopedic surgeon in May 2006 as well as a doctor at the VA hospital, but learned that equipment needed for back surgery would not be covered by Medi-CAL. (A.R. 231-56.) Plaintiff reported on February 9, 2006, that he could go to school but could not work because of the pain. (A.R. 242.) Worsening of pain was reported throughout the last quarter of 2006, and Plaintiff's doctor at the VA advised Plaintiff concerning back surgery. (A.R. 249-50.) It appears that Plaintiff continued with his treatment throughout early 2007 until the hearing held before the ALJ.

The only gaps reflected by the record are thus a couple of intervals of several months at the beginning of the period of alleged disability and during the initial treatment. Although this might support an inference that Plaintiff's symptoms were not as serious at the beginning, in view of Plaintiff's documented claims of increasing pain and symptoms, and his continual attempts at obtaining adequate treatment, this reasoning does not rise to the level of clear and convincing force. Further, it appears that Plaintiff and his treating sources actively sought additional modes of treatment, including physical therapy and surgery, which apparently did not occur

because of essentially financial limitations of Medi-CAL and the VA program, Plaintiff's sources of treatment or resources for treatment.

The Court concludes that this reason was not supported by substantial evidence in the record, and, to the extent supported, was not clear and convincing.

Although the ALJ concluded that Plaintiff was not taking medications of a type and dosage consistent with his allegations, the record does not support this conclusion. It is true that when he first applied, Plaintiff took only Naprosyn and Tylenol. (A.R. 74.) Further, in 2005 it was noted that he also had been taking sample pain medications that he had been given by his private doctor, but Plaintiff could not recall their names. (A.R. 138.) However, Plaintiff took Soma and Flexeril (A.R. 251, 170), and in December 2006, Plaintiff was prescribed Vicodin and 400 milligrams of Neurontin three times a day for severe pain. (A.R. 250.) At the time of the hearing, the record fairly reflects Plaintiff took multiple medications for pain, including Toradol injections for extreme pain, with a daily regimen of 1600 milligrams of Neurontin, over 2,000 milligrams of Tylenol with additional Tylenol in Vicodin, and Vicodin. (A.R. 284, 259-60.) Plaintiff testified that he took medication that made him sleepy three times a day. (A.R. 275.) The record simply does not bear out the ALJ's conclusion concerning the inconsistency of Plaintiff's medications with serious pain.

Further, the record does not support the ALJ's finding that "the record" does not indicate that Plaintiff suffered from debilitating side effects from his medication. (A.R. 16.)

Plaintiff testified that he took medication several times a day, and it made him groggy, sleepy, and very moody; it contributed to his depression and inability to concentrate or focus sufficiently to maintain progress in school. (A.R. 275, 285-86.) He spent a lot of days in a haze, groggy, and sleeping. Medical records, however, did not reflect any reports of side-effects, with the exception of a reference in October 2005 to the Vicodin's helping with the worsening back pain accompanied by a qualification that Plaintiff worked as a driver delivering newspapers, thus warranting an inference that the Vicodin was not compatible with Plaintiff's driving.

Thus, the record does not support the ALJ's broad statement about lack of record indicia of side-effects from his medication.

Although the record does support the ALJ's finding that no treating or examining physician had stated that Plaintiff was totally and permanently disabled from all work, the Court questions the probative force of this reasoning in light of the determinations of disability reflected in the entire record. Plaintiff's treating physician, Dr. Rodriguez, had determined that Plaintiff lacked the capacity to lift any weight, and his capacity to stand and sit was evaluated to be less than that required for light work. (A.R. 239-40.) Further, a physician at the VA in December 2006, just several months before the hearing before the ALJ, gave Plaintiff temporary disability until he completed school (A.R. 249-50.) In view of the significant evidence from treating physicians indicating Plaintiff's inability to work, the Court does not find particularly probative, let alone clear and convincing, the fact that

Plaintiff had not been declared totally and permanently disabled as he continued to attempt ever-reduced levels of activity during the gradual deterioration of his condition.

In summary, some of the reasons stated by the ALJ were supported by substantial evidence in the record and were of clear and convincing force. Some of the reasons were not supported, and some were not of clear and convincing force despite there being evidentiary support for them in the record.

Where only some of the specific reasons stated by an ALJ for rejecting an applicant's credibility are legally sufficient or supported by the record, but others are not, the Court must consider whether the ALJ's reliance on invalid reasons was harmless error. Batson v. Commissioner of Social Security administration, 359 F.3d 1190, 1195-97 (9th Cir. 2004). Such errors are harmless and do not warrant reversal where there remains substantial evidence supporting the ALJ's conclusions on credibility, and the error does not negate the validity of the ALJ's ultimate credibility conclusions. Carmickle v. Commissioner, Social Security Administration, 533 F.3d 1155, 1162 (9th Cir. 2008). The relevant inquiry is not whether the ALJ would have made a different decision absent any error, but rather whether the ALJ's decision remains legally valid despite such error. Id.

Here, Plaintiff's daily activities and the ALJ's observations of Plaintiff at the hearing were supported by substantial evidence in the record; reasoning based on Plaintiff's daily activities was generally clear and convincing in force. The pertinent question is whether or not the multiple

errors committed by the ALJ in his reasoning negated the validity
of the ALJ's ultimate credibility conclusions.

The errors related predominantly to the medical evidence,
including the mistaken conclusion that there was an absence of
pathology reasonably likely to produce the symptoms; other
conclusions that in context were unpersuasive concerning
Plaintiff's treatment, including its conservative nature and gaps
therein; and the mistaken conclusions concerning the absence of
any record evidence of side-effects of medication. The ALJ also
appeared to place undue emphasis on the lack of treaters'
opinions that Plaintiff was permanently totally disabled, and on
Plaintiff's having made statements about his abilities before
significant worsening of his symptoms. The ALJ was mistaken about
the content and import of Plaintiff's own assessments of his
abilities. The multiple errors affected one very basic and
important area of examination of credibility factors, namely, the
medical record. It could be argued that mistakes concerning the
medical record would obscure the appropriate context within which
one's behavior and statements are interpreted. On the other hand,
Plaintiff's daily activities are separable from the medical
record and are not necessarily undermined by the ALJ's errors
concerning the medical evidence.

In summary, the Court concludes that the factors
appropriately relied upon by the ALJ in making credibility
findings were not undermined by the ALJ's other, multiple
mistakes in reasoning concerning the medical evidence and
Plaintiff's medical treatment. Although there might have been
factors supporting Plaintiff's credibility, and even though

several factors relied upon by the ALJ were not supported by the

record or were not sufficiently clear and convincing, the ALJ

nevertheless articulated other clear and convincing reasons,

supported by substantial evidence, for discrediting Plaintiff's

subjective complaints. Cf. Batson v. Commissioner of the Social

Security Administration, 359 F.3d 1190, 1196 (9th Cir. 2004). The

other reasons, namely, Plaintiff's daily activities and the ALJ's

observations of Plaintiff, were sufficiently independent and

probative for the Court to conclude that their validity was not

negated by the errors committed by the ALJ in the course of the

credibility analysis. The errors made were thus harmless and do

not warrant reversal. Carmickle v. Commissioner, Social Security

Administration, 533 F.3d 1155, 1162 (9th Cir. 2008).

VII. Treatment of Expert Opinions

The ALJ said the following concerning the opinion of

Plaintiff's treating physician, Dr. Rodriguez:

> After considering the totality of the evidence, I
> do not give controlling weight to Dr. Jesus Rodriguez's
> opinion of the claimant's resulting limitations for
> the following reasons: First, with regard to the
> medical assessment report completed on March 6, 2006,
> (Exhibit 7F, p.p. (sic) 11-13), Dr. Rodriguez does
> not provide objective medical evidence, just checks
> the boxes. Second, when one views the objective medical
> evidence of record, it is (sic) becomes clear that
> Dr. Rodriguez's opinion of the claimant's limitations is
> a conclusion based solely upon the claimant's subjective
> complaints, as opposed to the objective evidence.
> There are no objective medical findings to support
> his opinions, including his own progress notes
> (Exhibit 7F). Third, Dr. Rodriguez's opinion of
> resulting functional limitations is not supported
> by the other substantial evidence of record, including
> the records of the claimant's consulting and
> examining sources. Since Dr. Rodriguez's opinion is
> not well supported by medically acceptable clinical
> and laboratory diagnostic techniques and is
> inconsistent with the other substantial evidence
> of record, it is not deserving of the great weight

33

generally accorded to he opinions of a treating physician, and is rejected (20 C.F.R. § 404.1527(d)(2)). (A.R. 17.)

As previously noted, the ALJ also cited as evidentiary support for this finding Plaintiff's statement made in the middle of 2005 to a claims representative that he felt that he could probably work if he had a sit down job and was currently enrolled at Fresno State with hopes of becoming a teacher, and the claims representative's observation of Plaintiff lifting a baby seat without a problem. (A.R. 17)

Plaintiff argues that the ALJ's reasons for rejecting Dr. Rodriguez's opinion are insufficient because they are not specific and legitimate and are not supported by substantial evidence in the record. Further, the opinion of Dr. Tran, relied upon by the ALJ, is not supported by substantial evidence because Dr. Tran did not consider much of the objective medical evidence in forming her opinion.

The standards for evaluating treating source's opinions are as follows:

> By rule, the Social Security Administration favors the opinion of a treating physician over non-treating physicians. See 20 C.F.R. § 404.1527. If a treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [it will be given] controlling weight." Id. § 404.1527(d)(2). If a treating physician's opinion is not given "controlling weight" because it is not "well-supported" or because it is inconsistent with other substantial evidence in the record, the Administration considers specified factors in determining the weight it will be given. Those factors include the "[l]ength of the treatment relationship and the frequency of examination" by the treating physician; and the "nature and extent

34

of the treatment relationship" between the patient and the treating physician. Id. § 404.1527(d)(2)(i)-(ii). Generally, the opinions of examining physicians are afforded more weight than those of non-examining physicians, and the opinions of examining non-treating physicians are afforded less weight than those of treating physicians. Id. § 404.1527(d)(1)-(2). Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; the specialty of the physician providing the opinion; and "[o]ther factors" such as the degree of understanding a physician has of the Administration's "disability programs and their evidentiary requirements" and the degree of his or her familiarity with other information in the case record. Id. § 404.1527(d)(3)-(6).

Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007).

As to the legal sufficiency of the ALJ's reasoning, the governing principles have been recently restated:

The opinions of treating doctors should be given more weight than the opinions of doctors who do not treat the claimant. Lester [v. Chater, 81 F.3d 821, 830 (9th Cir.1995) (as amended).] Where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons supported by substantial evidence in the record. Id. (internal quotation marks omitted). Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record. Id. at 830, quoting Murray v. Heckler, 722 F.2d 499, 502 (9th Cir.1983). This can be done by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings. Magallanes [v. Bowen, 881 F.2d 747, 751 (9th Cir.1989).] The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct. Embrey v. Bowen, 849 F.2d 418, 421-22 (9th Cir.1988). Reddick v. Chater, 157 F.3d 715, 725 (9th Cir.1998); accord Thomas, 278 F.3d at 957; Lester, 81 F.3d at 830-31.

Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007).

With respect to weighing the medical opinions of treating sources, a lack of controlling weight does not necessarily mean that the opinion should be rejected. The court in <u>Orn</u> turned to the Social Security Administration's explanation of the regulations set forth in S.S.R. 96-2p, which provides in relevant part:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527.... In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.
> S.S.R. 96-2p at 4 (Cum. Ed.1996), available at 61 Fed.Reg. 34,490, 34,491 (July 2, 1996).

<u>Orn v. Astrue</u>, 495 F.3d 625, 633 (9th Cir. 2007).

It is permissible for an ALJ to prefer an opinion supported by specific clinical findings and an explanation thereof over a check-off type of form lacking an explanation of the basis for the conclusions. <u>Crane v. Shalala</u>, 76 F.3d 251, 253 (9th Cir. 1996) (citing <u>Murray v. Heckler</u>, 722 F.2d 499, 501 (9th Cir. 1983)); <u>see</u> <u>Batson v. Commissioner of the Social Security Administration</u>, 359 F.3d 1190, 1195 (9th Cir. 2004).

Here, the ALJ stated that Dr. Rodriguez did not provide any objective medical evidence, but just checked the boxes. However, in the very form referred to by the ALJ, Dr. Rodriguez referred to multilevel degenerative disc disease causing neural foraminal stenosis and to circumferential disc bulging with focal height lateral protrusion at L3-4, that resulted in moderate right and

mild left neural foraminal stenosis. (A.R. 239.) The doctor
repeatedly referred to this statement of objective medical
evidence with respect to each functional impairment he evaluated.
(A.R. 239-41.) Thus, the ALJ's first reason, although specific,
was not supported by substantial evidence in the record, and thus
was not legitimate under the circumstances.

It is established that the opinion of a treating physician
may be rejected if it is ambiguous and inconsistent or
conclusionary in form and not supported by clinical findings.
Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992);
Magallanes v. Bowen, 881 F.2d 747, 751. Further, the fact that an
opinion is based primarily on the patient's subjective complaints
may be properly considered. Matney on Behalf of Matney v.
Sullivan, 981 F.2d 1016, 1020 (9th Cir. 1992). Where a treating
source's opinion is based largely on the Plaintiff's own
subjective description of his or her symptoms, and the ALJ has
discredited the Plaintiff's claim as to those subjective
symptoms, the ALJ may reject the treating source's opinion. Fair
v. Bowen, 885 F.2d 597, 605 (9th Cir. 1989).

The Court finds unsupported the ALJ's conclusion that it was
clear from the objective medical evidence that Dr. Rodriguez's
opinion was based solely on Plaintiff's subjective complaints and
was unsupported by any objective medical findings, including Dr.
Rodriguez's own progress notes.

An impairment must be established not merely by a claimant's
statement of symptoms but by medical evidence consisting of
signs, symptoms, and laboratory findings. 20 C.F.R. § 404.1508. A
"symptom" is the claimant's own description of a physical or

mental impairment. 20 C.F.R. § 404.1528(a). "Signs" are anatomical, physiological, or psychological abnormalities which can be observed apart from symptoms; signs must be shown by medically acceptable clinical diagnostic techniques. Id. at § 404.1528(b). The third category of evidence, "laboratory findings," are anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques, including things such as chemical tests, electrophysiological studies, roentgenological studies, and psychological tests. 20 C.F.R. § 404.1528(b).

Here, there are numerous radiological studies as well as the quite detailed report of the magnetic resonance imaging study that revealed multi-level degenerative disc disease causing neural foraminal stenosis, including focal right lateral protrusion extending into the neural foramen and actually contacting the undersurface of the exiting right L3 nerve root. Later studies revealed various defects, facet hypertrophy, and vacuum disc phenomenon. By January 2007, an MRI revealed mild spondylolisthesis of L5 on S1 with bilateral spondylolysis. (A.R. 234-35, 258.) Notes from various times and treaters, including but not limited to Dr. Rodriguez, reflect signs such as indications of positive straight leg raise in the left leg and ambulation favoring the right leg (A.R. 172), muscle spasms and tenderness (A.R. 164), unspecified abnormal signs resulting in an assessment of sciatica (A.R. 243), tenderness and limited range of motion secondary to pain (A.R. 242), pain with movement (A.R. 238), and pain to palpation (A.R. 233, 231). There is no indication that the techniques used by Dr. Rodriguez differed in

their basic nature from those used by the other experts, although Dr. Rodriguez had additional information of both the objective and subjective sort due to the multiple studies considered and the long-term treating relationship he had maintained with Plaintiff. The record thus reflects that Dr. Rodriguez's opinion was based on, and well supported by, medically acceptable clinical and laboratory diagnostic techniques

Accordingly, the Court concludes that the ALJ's conclusions regarding the lack of objective medical evidence to support the opinion of Dr. Rodriguez and concerning the opinion's having been based only on Plaintiff's subjective complaints lack the support of substantial evidence.

With respect to the ALJ's conclusion that Dr. Rodriguez's opinion of functional limitations was not supported by other substantial evidence of record, including the records of Plaintiff's consulting and examining sources, it is necessary to consider the evidence to which the ALJ referred.

The Court considers the examination and report of the consulting examiner, Dr. Tran, which Plaintiff challenges as lacking the support of substantial evidence to support the ALJ's conclusions. Dr. Tran's findings of September 2005 were normal or mild, with tenderness to palpation and pain with movement. The impression was tentative (back pain "probably mechanical with lumbar spondylosis with end discogenic back pain" [A.R. 161]), which was understandable because the opinion was based on only the examination and review of some progress notes, but not on any scans or x-rays. (A.R. 159.) The opinion of Dr. Tran from September 2005 that Plaintiff could perform heavy work with

postural limitations predated all of the significant diagnostic
tests and studies as well as a year and one-half of worsening
symptoms. That even the ALJ recognized the importance of the
later evidence is demonstrated by the ALJ's separate finding that
the opinions of the state agency physicians, who found,
respectively, that Plaintiff could perform heavy and light work
with postural limitations, were afforded less weight than they
might have otherwise merited because they never had the
opportunity to review subsequently admitted evidence, with a
reference to records of a year and one-half of treatment from the
VA extending from July 2005 through February 2007. (A.R. 14.) The
Court notes that it appears that the initial state agency
consultant, who rendered his opinion after Dr. Tran's
examination, did not even have MRI results to consider, let alone
all the later progress notes and diagnostic tests. The second
state agency consultant rendered an opinion in January 2006.

The Court further notes the ALJ's rejection of the judgment
shared by Dr. Tran and Dr. Ginsburg that Plaintiff could engage
in heavy lifting, a conclusion that clearly manifests the ALJ's
determination that the functional limitations assigned by Dr.
Tran were significantly undercut by the results of the later
diagnostic tests.

One important factor in evaluating an expert opinion is the
extent to which an acceptable medical source is familiar with the
other information in the case record; an opinion should be based
on the Plaintiff's condition as a whole. 20 C.F.R. §
404.1527(d)(6). It is established that a more recent opinion may
be entitled to greater deference than an older opinion, as may an

opinion which describes or considers more significant medical events or conditions. <u>Orn v. Astrue</u>, 495 F.3d 625, 633-34 (9th Cir. 2007).

Because Dr. Tran's findings and opinion were based on the very limited basis of her own examination, and because she was unfamiliar with significant objective medical evidence, the Court concludes that ALJ's reliance on Dr. Tran's findings and opinion as evincing an absence of support for Dr. Rodriguez's opinion did not constitute a legitimate reason.

With respect to the opinions of the state agency physicians, because of their likewise limited basis, and because of the ALJ's express placing of less weight on them, the opinions of the non-examining state agency physicians do not present a significant inconsistency.

The other objective medical evidence of record has been previously discussed, and although Plaintiff's treating sources sometimes found some normal or mild signs, they also found signs on examination that were not inconsistent with the test results and which were not unsupportive of Dr. Rodriguez's opinion in light of the entire medical record.

The Court therefore concludes that the ALJ failed to state specific and legitimate reasons, supported by substantial evidence, to support his rejection of the opinion of Dr. Rodriguez.

Further, for the reasons discussed above, the opinion of Dr. Tran and the state agency physicians did not constitute substantial evidence supporting the ALJ's conclusion.

/////

VIII. <u>Remedy</u>

A district court is authorized to affirm, modify, or reverse a decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. 42 U.S.C. § 405(g). The decision whether to remand a matter pursuant to sentence four of § 405(g) or to order immediate payment of benefits is within the discretion of the district court. <u>Harman v. Apfel</u>, 211 F.3d 1172, 1178 (9th Cir. 2000). When a court reverses an administrative agency determination, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. <u>Moisa v. Barnhart</u>, 367 F.3d 882, 886 (9th Cir. 2004) (citing <u>INS v. Ventura</u>, 537 U.S. 12, 16 (2002)). It is not necessary to order an award of benefits, <u>Connett v. Barnhart</u>, 340 F.3d 871, 876 (9th Cir. 2003), but an award is generally directed where no useful purpose would be served by further administrative proceedings, or where the record has been thoroughly developed. <u>Varney v. Secretary of Health and Human Services</u>, 859 F.2d 1396, 1399 (9th Cir. 1988).

Where the ALJ has failed to provide legally sufficient reasons for rejecting the treating physicians' opinions, the evidence is credited as true. <u>Harman v. Apfel</u>, 211 F.3d 1172, 1179 (9th Cir. 2000). If there are no outstanding issues that must be resolved before a determination of disability can be made, and where it is clear from the record that the ALJ would be required to find the claimant disabled if the evidence were credited, then remand for an award of benefits is appropriate. <u>Id.</u> at 1178. In these circumstances, the record has been fully developed, and further administrative proceedings would serve no

useful purpose. <u>Benecke v. Barnhart</u>, 379 F.3d 587, 593-96 (9th Cir. 2004).

Here, the opinions of the treating physicians must be credited as true. At the hearing before the ALJ, the vocational expert (VE) was asked if there would be any work in the national economy that could be performed by a person of Plaintiff's age, education, and work history who could lift no weight on an occasional or frequent basis, and could stand and walk two to four hours and sit two to four hours in an eight-hour day. (A.R. 288-89.) The VE replied in the negative. (A.R. 289.) Thus, it is clear that if the opinion of Plaintiff's treating physician is credited, Plaintiff was disabled.

The only issue that appears to remain for determination is the date of onset of disability. <u>See</u>, <u>Morgan v. Sullivan</u>, 945 F.2d 1079, 1080 (9th Cir. 1991).

Here, Plaintiff filed her application for disability benefits in June 2005 claiming disability since March 2004; the medical evidence summarized in the ALJ's decision covered the time period from 2004 through 2007. It is not clear what the date of onset was. However, in all other respects, the tasks of the administrative fact finder are complete. <u>See</u>, <u>Regennitter v. Commissioner of Social Security Administration</u>, 166 F.3d 1294, 1300 (9th Cir. 1999).

IX. <u>Recommendations</u>

In accordance with the foregoing analysis, the Court concludes that the ALJ's decision was not supported by substantial evidence in the record as a whole and was not based on proper legal standards.

Accordingly, it IS RECOMMENDED that

1. Plaintiff's social security complaint BE GRANTED, and

2. The matter BE REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings to consist of an award of benefits, and for determination of the sole issue of when the date of onset of Plaintiff's disability was; and

3. Judgment BE ENTERED for Plaintiff Charles Brown, Sr., and against Defendant Michael J. Astrue.

This report and recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Replies to the objections shall be served and filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:   March 26, 2009**         **/s/ Sandra M. Snyder**
                              UNITED STATES MAGISTRATE JUDGE